1  Lisa M. Carvalho (SBN 161420)
   Email:  lcarvalho@reedsmith.com
2  Daniel J. Valim (SBN 233061)
   Email:  dvalim@reedsmith.com
3  REED SMITH LLP
   1999 Harrison Street, Suite 2400
4  Oakland, CA  94612-3572

5  **Mailing Address:**
   P.O. Box 2084
6  Oakland, CA  94604-2084

7  Telephone:     +1 510 763 2000
   Facsimile:     +1 510 273 8832
8
   Attorneys for Defendant
9  Schering-Plough Corporation

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12  SHELLEY BLAM,                          No.: C 08-03944 MMC

13                    Plaintiff,           **DECLARATION OF VINCENT SWEENEY
                                           IN SUPPORT OF DEFENDANT**
14        vs.                              **SCHERING-PLOUGH CORPORATION'S
                                           MOTION TO DISMISS COMPLAINT**
15  SCHERING-PLOUGH CORPORATION, DOES
    1 TO 10,                               **Date:          October 3, 2008**
16                                         **Time:          9:00 a.m.**
                  Defendants.              **Place:         Courtroom 7**
17
                                           **Hon. Maxine M. Chesney**
18

19        I, Vincent Sweeney, declare as follows:

20        1.     I have been a member of Defendant Schering-Plough Corporation's Severance

21  Benefit Plan Committee since February 4, 2004.  I make this Declaration in support of Defendant

22  Schering-Plough Corporation's Motion to Dismiss Plaintiff's Complaint.  Except as otherwise

23  stated, I have personal knowledge of the matters stated herein and, if called and sworn as a witness,

24  could and would testify competently thereto.

25

26        2.     Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Schering-Plough

27  Corporation Severance Benefit Plan, amended and restated effective December 17, 2004, with

28  amendments through June 21, 2005 (the "Severance Benefit Plan").  The Severance Benefit Plan

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 1 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    provides severance benefits to certain eligible employees of Schering-Plough Corporation's

2    participating affiliates that have adopted the plan.  Schering Corporation, plaintiff Shelley Blam's

3    employer, adopted the plan.  The Severance Benefit Plan governed Plaintiff Shelley Blam's

4    severance benefits, including any severance pay to which she may or may not have been entitled at

5    the time of the termination of her employment with Schering Corporation.

6

7         3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of a January 16, 2008 letter

8    signed by me on behalf of the Severance Benefit Plan Committee, denying Plaintiff's initial Claim

9    for Benefits Under the Schering-Plough Corporation Severance Benefit Plan.

10

11        4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of a May 8, 2008 letter signed

12   by me on behalf of the Severance Benefit Plan Committee, denying Plaintiff's Appeal of Claim for

13   Benefits Under the Schering-Plough Corporation Severance Benefit Plan.

14

15        I declare under penalty of perjury under the laws of the United States that the foregoing is

16   true and correct.

17

18   DATED: August __25__, 2008

19

20                                        _Vincent Sweeney_____
                                          Vincent Sweeney

21

22

23

24

25

26

27

28

Declaration of Vincent Sweeney In Support of Defendant's Motion to Dismiss Complaint
No. C 08-3944 MHP

**EXHIBIT A**

**No. C08-03944 MMC**

SCHERING-PLOUGH CORPORATION

SEVERANCE BENEFIT PLAN

AMENDED AND RESTATED EFFECTIVE DECEMBER 17, 2004

WITH AMENDMENTS THROUGH JUNE 21, 2005

## PREAMBLE

Schering-Plough Corporation ("Schering-Plough") established the Schering-Plough Severance Benefit Plan (the "Plan") for the purpose of providing severance benefits to certain Employees whose employment terminates on or after February 4, 2004. The Plan constitutes a formal employee welfare benefit plan under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Plan is hereby amended and restated, effective for all terminations occurring on or after December 17, 2004, and supersedes any policy, plan, or program theretofore maintained or in effect under which Schering-Plough, or any of its U.S. affiliated companies (or their predecessors), ever made payments of severance benefits prior to December 17, 2004.

The Plan, as set forth herein, is intended to alleviate in part or in full financial hardships that may be experienced by certain of those Employees of Schering-Plough and its U.S. affiliated companies, whose employment is terminated for certain reasons. In essence, benefits under the Plan are intended to be supplemental unemployment benefits. The Plan is not intended to be included in the definitions of "employee pension benefit plan" and "pension plan" set forth under Section 3(2) of ERISA as a "severance pay arrangement" within the meaning of Section 3(2)(b)(i) of ERISA. Rather, the Plan is intended to meet the descriptive requirements of a plan constituting a "severance pay plan" within the meaning of regulations published by the Secretary of Labor at Title 29, *Code of Federal Regulations*, Section 2510.3-2(b). Accordingly, the benefits paid by the Plan are not deferred compensation and no employee shall have a vested right to such benefits.

The Plan shall continue until such time as it is amended or terminated in accordance with Article 6.

# TABLE OF CONTENTS

**Page**

ARTICLE 1   DEFINITIONS..................................................................................................1

ARTICLE 2   PARTICIPATION AND ELIGIBILITY FOR BENEFITS................................6

ARTICLE 3   BENEFITS......................................................................................................8

ARTICLE 4   METHOD OF SEVERANCE PAYMENTS ....................................................11

ARTICLE 5   THE ADMINISTRATIVE COMMITTEE........................................................12

ARTICLE 6   AMENDMENT AND TERMINATION............................................................13

ARTICLE 7   CLAIMS PROCEDURES ..............................................................................14

ARTICLE 8   MISCELLANEOUS .......................................................................................15

**Article 1**
**DEFINITIONS**

When used herein, the following terms shall have the meanings set forth below.

1.01   "**Administrative Committee**" means Schering-Plough Corporation's Employee Benefits Committee or its designee.

1.02   "**Base Pay**" means the Employee's highest Weekly Base Rate of Pay during the 12 month period prior to his or her termination.

In the case of a Termination Due to Change of Control, Base Pay shall mean the sum of (a) Employee's highest Weekly Base Rate of Pay during the 12 month period prior to his or her termination or, if greater, the Employee's Weekly Base Rate of Pay in effect immediately prior to such Change of Control, and (b) an amount equal to 1/52 of the Employee's annual Target Incentive. Notwithstanding the foregoing, for purposes of calculating Base Pay in order to determine a Participant's benefit under Column A of Exhibit B, Base Pay shall not include any portion of the Employee's Target Incentive.

1.03   "**Benefits**" means the benefits that a Participant is eligible to receive pursuant to Article 3 of the Plan.

1.04   "**Change of Control**" means a Change of Control (or Change in Control) as defined in the Company's 2002 Stock Incentive Plan and any successor to such plan.

1.05   "**Company**" means Schering-Plough Corporation and its U.S. affiliated companies.

1.06   "**Comparable Position**" means employment with the Company or a successor employer in which the individual's level of responsibilities would not constitute a Demotion. For purposes of a Termination Due to Change of Control, a position shall not be a Comparable Position if such position would require the Employee's principal business location to be relocated more than 50 miles from the Employee's principal business location immediately prior to the Change of Control.

1.07   "**Corporate Integrity Agreement**" means the five-year settlement agreement entered into between the Company and the Office of Inspector General of the U.S. Department of Health and Human Services, effective July 29, 2004.

1.08   "**Demotion**" means continued employment in a position that, as determined by the Administrative Committee, constitutes a demotion under Schering-Plough's U.S. compensation guidelines or a position that is one or more levels lower on a Company-recognized career ladder, whether or not such employment is with the Company or a successor employer.

1.09   "**Decline to Relocate**" means a termination of a Participant's employment as a result of his or her rejection of an offer of continued employment in the same position or a

Comparable Position that would require relocation of the Participant's principal business location of more than 50 miles.

1.10 **"Employee"** means any regular full-time or regular part-time employee of the Company who is employed in the United States and as to whom the terms and conditions of employment are not covered by a collective bargaining agreement unless the collective bargaining agreement specifically provides for coverage under the Plan. For this purpose, a regular part-time employee shall be an employee who is regularly scheduled to work approximately 20 to 32 hours per week. The term "Employee" shall not include (a) temporary employees (including college coops, summer employees, high school coops, flexible workforce employees and any other such temporary classifications); (b) any individual characterized by the Company as an "independent contractor" or as a "contract worker;" (c) officers and other employees of the Company who are parties to employment agreements; (d) officers or other employees of the Company who participate in any severance plan of the Company that provides for the payment of severance benefits in connection with a Change of Control of the Company and such individual qualifies for the payment of such benefits; (e) any other individual who is not treated by the Company as an employee for purposes of withholding federal income taxes, regardless of any contrary Internal Revenue Service, governmental, or judicial determination relating to such employment status or tax withholding; or (f) effective April 13, 2005, any employee of the Company who (i) is not a U.S. citizen, (ii) is on temporary assignment in the United States, and (iii) normally works outside the United States. In the event that an individual engaged in an independent contractor or similar non-employee capacity is subsequently reclassified by the Company, the Internal Revenue Service, or a court as an employee, such individual, for purposes of the Plan, shall be deemed an Employee from the actual (and not effective) date of such classification, unless expressly provided otherwise by the Company.

An Employee also includes any employee of the Company otherwise satisfying the definition for Employee above who works in the United States permanently or who normally works in the United States and receives compensation from one of the Company's United States affiliates or participating companies but is on temporary assignment outside of the United States.

1.11 **"Employment Service Date"** means the first day on which an individual became an Employee.

1.12 **"Employment Termination Date"** means the date on which the employment of the Employee by the Company is terminated.

1.13 **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

1.14 **"Job Elimination"** means a termination of a Participant's employment by the Company due to job elimination, as determined by the Administrative Committee in its sole discretion, for purposes of the Plan only.

1.15   "**Job Restructuring**" means a termination of a Participant's employment by the Company due to a change in required competencies or qualifications for the Participant's job, as determined by the Administrative Committee in its sole discretion, for purposes of the Plan only.

1.16   "**Misconduct**" means conduct which includes (a) falsification of company records/misrepresentation; (b) theft; (c) acts or threats of violence; (d) refusal to carry out assigned work; (e) unauthorized possession of alcohol or illegal drugs on company premises; (f) being under the influence of alcohol or illegal drugs during work hours; (g) willful intent to damage or destroy company property; (h) violation of the Standards of Global Business Practices; (i) acts of discrimination/harassment; (j) conduct jeopardizing the integrity of our products; (k) violation of Company rules, policies, and/or practices; or (l) other conduct considered to be detrimental to the Company.

1.17   "**Participant**" means any Terminated Employee eligible for Benefits in accordance with Article 2.

1.18   "**Plan**" means the Schering-Plough Severance Benefit Plan, as set forth herein, and as the same may from time to time be amended.

1.19   "**Plan Year**" means the period commencing on each January 1 during which the Plan is in effect and ending on the subsequent December 31.

1.20   "**Severance Benefit Plan Committee**" means the Committee that reviews initial benefit claims under the Plan, which shall be comprised of no less than three members who shall include the Company's Executive Director of Global Benefits, and Vice Presidents of Human Resources representing the Company's major operating groups as the Company shall appoint.

1.21   "**Target Incentive**" means an Employee's target incentive for any given year under the Company's annual incentive plan applicable to the Employee immediately preceding his or her termination. Notwithstanding the foregoing sentence, in the event of a Termination Due to Change of Control, Target Incentive shall mean the greater of the Target Incentive described in the preceding sentence or the Target Incentive in effect immediately preceding the Change of Control.

1.22   "**Terminated Employee**" means an Employee who has experienced an Employment Termination Date.

1.23   "**Termination Due to Change of Control**" means a termination of a Participant's employment by the Company within two years following a Change of Control that is involuntary or that is as a result of his or her written rejection of an offer of continued employment with the Company or an affiliate if such employment is not a Comparable Position. For purposes of the preceding sentence, an involuntary termination shall be deemed to occur as of the sixtieth (60th) day (or such longer period of time as the Company shall establish not to exceed one year) immediately following the later of (a) the date on which the Participant rejects in writing an offer of continued employment

with the Company or an affiliate for a position that is not a Comparable Position; or (b) the date of the Change of Control.

1.24    "**Termination Due to Non-Performance**" means a termination of an Employee's employment by the Company due to the Employee's failure to perform his or her job assignments in a satisfactory manner, as determined by the Administrative Committee in its sole discretion, for purposes of the Plan only.  In addition, a Termination Due to Non-Performance means a termination of an Employee's employment by the Company due to the Employee being deemed an "ineligible person" pursuant to the Corporate Integrity Agreement.

1.25    "**Termination Due to Workforce Restructuring**" means termination of an Employee's employment by the Company due to a Decline to Relocate, a Job Elimination, a Job Restructuring, or such other termination determined by the Administrative Committee.

An Employee who has been absent from employment on a (a) short-term disability leave, or (b) long-term disability leave or "medical no pay" leave lasting, in the aggregate, for a period of less than two years shall be deemed to have suffered a Termination Due to Workforce Restructuring if neither the Employee's latest position nor a Comparable Position exists for the Employee once he or she is released to return to work.  Nothing in this paragraph shall prevent such an Employee from experiencing a Termination Due to Workforce Restructuring as a result of a Job Elimination, Job Restructuring, or other determination by the Administrative Committee or its designee to the extent otherwise provided under this Plan.

1.26    "**Voluntary Resignation**" means a resignation that is a voluntary separation from employment initiated by the Employee.

1.27    "**Weekly Base Rate of Pay**" means

(a)    for a regular full-time Employee paid on a weekly payroll period basis, the Employee's weekly rate of pay.

(b)    for a regular full-time Employee paid on a bi-monthly payroll period basis, the Employee's rate of pay for one payroll period divided by 2.166.

(c)    for a regular part-time Employee paid on any hourly basis, the Employee's highest base hourly rate during the last 12 months multiplied by the average number of weekly hours worked during that 12 month period.

1.28    "**Years of Service**" means the total number of a Participant's full years of active service with the Company subject to the following rules:

(a)    For purposes of determining a Participant's number of Years of Service, a full year of active service is any consecutive twelve-month period of service occurring after the Participant's most recent break in service lasting one year or more.  For example, a Participant whose Employment Service Date is June 21, 2003 will be credited with

one Year of Service at the end of the business day June 20, 2004 provided that he or she has been continuously employed by the Company through that date.

(b)   For purposes of determining a Participant's number of Years of Service, such Participant shall be treated as if his Employment Termination Date was December 31 of the calendar year in which his or her actual Employment Termination Date occurs.

(c)   Any break in a Participant's active service for a period of less than one year shall be disregarded for purposes of calculating a Participant's number of Years of Service. For example, a Participant who was hired on June 1, 2000, was terminated on February 3, 2002, rehired on December 18, 2002, and terminated again on March 3, 2003 shall have three Years of Service under the Plan.

(d)   Notwithstanding the foregoing, a Participant's service earned prior to incurring a break in service of less than 12 months and for which the Participant received a severance benefit under this Plan or any other severance plan or arrangement sponsored by the Company shall not be credited as Years of Service under the Plan. For example, a Participant who was hired on January 1, 2000, terminated on June 1, 2001 and received a severance benefit in connection with those years of service and was rehired on January 1, 2007 shall, as of December 31, 2008, be credited with one Year of Service.

## Article 2
### PARTICIPATION AND ELIGIBILITY FOR BENEFITS

2.01   Eligibility.

(a)   Subject to Sections 2.01(b), 2.02, and 2.03, any Terminated Employee (other than an employee who is employed in Puerto Rico) who has provided the Company with at least 90 consecutive days of service and incurs a Termination Due to Workforce Restructuring, a Termination Due to Non-Performance, or a Termination Due to Change of Control shall become a Participant and shall be eligible for Benefits in accordance with the provisions of this Plan. A Terminated Employee who is eligible to participate in the Plan as a result of a Termination Due to Change of Control shall not otherwise be deemed to have incurred a Termination Due to Workforce Restructuring or a Termination Due to Non-Performance.

For purposes of determining whether a Participant who either (i) transferred employment from NeoGenesis Pharmaceuticals, Inc. to the Company in connection with the asset purchase agreement, dated February 14, 2005, or (ii) became an Employee as a result of the Company's collaborative agreement with Bayer HealthCare AG, dated October 1, 2004, has satisfied the 90 consecutive days of service requirement set forth in this section 2.01(a) above, his or her service shall include service with NeoGenesis Pharmaceuticals, Inc., and Bayer HealthCare AG, as appropriate. In no event shall such individual be credited with such prior service for purposes of calculating their severance benefits under the Plan.

(b)   Notwithstanding anything herein to the contrary, a Terminated Employee shall not be considered to have incurred a Termination Due to Workforce Restructuring, a Termination Due to Non-Performance, or a Termination Due to Change of Control for the purposes of the Plan, if his or her employment is discontinued due to (i) a Voluntary Resignation; (ii) voluntary resignation after reaching early or normal retirement date under the Company's qualified pension plan; (iii) the divestiture of a business unit of the Company if the Employee is offered a Comparable Position with the Company or a successor employer; (iv) a rejection of an offer of a Comparable Position that is not a Decline to Relocate; (v) a Decline to Relocate and such Terminated Employee was on international assignment immediately preceding his or her termination; (vi) discharge for Misconduct; (vii) being placed on layoff status; (viii) failure to transfer to another location after initially accepting the transfer within the acceptance period of the offer; (ix) a termination of employment during or immediately following a long-term disability leave or a "medical no pay" leave lasting, in the aggregate, at least two years; (x) death; or (xi) his or her refusal to cooperate with the screening process pursuant to the Corporate Integrity Agreement.

(c)   Notwithstanding anything herein to the contrary, in no event shall any Employee or former Employee who is receiving benefits under a Company-sponsored long-term disability plan and/or who was on "medical no pay" leave of absence lasting, in the aggregate, for a period of two consecutive years or more ending at or immediately preceding the time of his or her termination of employment be eligible for Benefits

under this Plan. For clarification purposes, the determination of whether an Employee or former Employee is ineligible for benefits as a result of the two-year leave of absence restriction set forth in the preceding sentence shall be made by aggregating any time periods in which the Employee or former Employee had received benefits under a Company-sponsored long-term disability plan together with any consecutive time periods that he or she was on "medical no pay" leave.

2.02    Termination of Eligibility for Benefits. A Participant shall cease to participate in the Plan, and all Benefits shall cease upon the occurrence of the earliest of:

    (a)    Termination of the Plan prior to, or more than two years following, a Change of Control;

    (b)    Inability of the Company to pay Benefits when due;

    (c)    Completion of payment to the Participant of the Benefits for which the Participant is eligible; and

    (d)    The Administrative Committee's determination, in its sole discretion, of the occurrence of the Employee's Misconduct, regardless of whether such determination occurs before or after the Employee's Employment Termination Date, unless the Administrative Committee determines in its sole discretion that Misconduct shall not cause the cessation of Benefits in a particular case. Notwithstanding the foregoing, the Administrative Committee must act in good faith in making such a determination at any time within the two years following a Change of Control.

2.03    Waiver and Release. Notwithstanding anything in the Plan to the contrary, unless determined otherwise by the Administrative Committee in its sole discretion, no Benefits shall be due or paid under the Plan to any Employee, unless the Employee executes (and does not rescind) a written waiver and release, in a form prescribed by Schering-Plough, of any and all claims against Schering-Plough, its affiliates, and all related parties arising out of the Employee's employment or termination of employment.

**Article 3**
**BENEFITS**

3.01   Amount of Severance Pay.  The amount of severance pay payable to a Participant shall be equal to the number of weeks of the Participant's Base Pay corresponding to his or her Years of Service at his or her Employment Termination Date as set forth on that portion of Exhibit A applicable to the reason for his or her termination from employment (determined by the Company, in its sole discretion) as listed on Exhibit A hereto.

In the event of a Termination Due to Change of Control, the amount of severance pay payable to a Participant shall be equal to the number of weeks of the Participant's Base Pay corresponding to his or her Years of Service at his or her Employment Termination Date as set forth under Column B of Exhibit B applicable to his or her band as listed on Exhibit B hereto.

Notwithstanding the foregoing, in the event of a Termination Due to Change of Control for a Participant who was an E-grade employee as of December 31, 2003, the amount of severance pay payable to the Participant shall be equal to the greater of the benefits as listed under Column A and B under Exhibit B hereto as applicable to E-grade employees and to his or her Years of Service at his or her Employment Termination Date.

Notwithstanding the foregoing, in the event of a Termination Due to Change of Control for a Participant who was a weekly/hourly or a semi-monthly employee as of December 31, 2003, the amount of severance pay payable to the Participant shall be equal to the greater of the benefits as listed under Column A and B under Exhibit B hereto as applicable to his or her pay status and Years of Service at his or her Employment Termination Date.

3.02   Medical and Dental Benefits.  A Participant covered under any of the Company's group medical and dental plans prior to his or her Employment Termination Date shall be provided the opportunity to elect to continue such coverage in accordance with the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, Section 4980B of the Internal Revenue Code of 1986, as amended, and Section 601, et seq., of ERISA ("COBRA") and in accordance with the Company's regular COBRA coverage payment practices.

Participants who experience a Termination Due to Workforce Restructuring or Termination due to Non-Performance shall be eligible to continue medical and dental benefits under COBRA coverage at active employee rates, as the same may be changed from time to time, for the greater of (a) three months or (b) the number of weeks of severance under Section 3.01 (to a maximum of 12 months) following his or her Employment Termination Date.

Participants who experience a Termination Due to Change of Control shall be eligible (a) to continue medical and dental benefits under COBRA coverage at active employee rates, as the same may be changed from time to time, for the greater of (i) three months or (ii) the number of weeks of severance pay under Section 3.01 (to a maximum of 18 months)

following his or her Employment Termination Date, and (b) for retiree medical benefits under the terms of the retiree medical coverage generally applicable to the Company's retiree medical eligible retirees provided that such Participants are at least age 50 at the time of their termination of employment.

3.03   Life Insurance.  Participants who experience a Termination Due to Workforce Restructuring or Termination Due to Non-Performance shall be eligible to receive continued basic life insurance coverage for the greater of (a) three months or (b) the number of weeks of severance under Section 3.01 (to a maximum of 12 months) following his or her Employment Termination Date.

Participants who experience a Termination Due to Change of Control shall be eligible to receive continued basic life insurance coverage for the greater of (a) three months or (b) the number of weeks of severance under Section 3.01 (to a maximum of 18 months) following his or her Employment Termination Date.  At the end of the coverage period, the Participant may convert the life insurance coverage to a personal policy.

3.04   Incentive Plan Payments.  A Participant's entitlement to an incentive payment under the annual incentive plan applicable to such Participant following a termination of employment and the amount of such incentive payment, if any, shall be determined solely be reference to the applicable terms of such annual incentive plan, provided, however, for purposes of calculating a Participant's severance pay with respect to a Termination Due to Change of Control, a Participant's Base Pay shall include a pro rata portion of his or her Target Incentive as described under the definition of Base Pay in Section 1.02 of the Plan.

3.05   Reduction for Other Payments; Offsets.  The Benefits payable hereunder to any Participant shall be reduced by any and all payments required to be made by the Company or its affiliates under federal, state, and local law, under any employment agreement or special severance arrangement or under any other separation policy, plan, or program.  The Benefits payable hereunder to any Participant shall also be reduced by (a) any benefits previously paid to such Participant under this or any other separation or severance plan sponsored by the Company with respect to any periods of service with respect to which Benefits are being paid under this Plan; and (b) any and all amounts that the Participant owes to the Company or an affiliate.

3.06   Effect on Other Benefit Plans.  Except as expressly provided herein, nothing under the Plan shall constitute an extension of eligibility for, or the vesting or exercise periods relating to, any employee benefit or equity compensation plan or an agreement with the Company.

3.07   Different Severance Benefits.  Notwithstanding the foregoing, the Human Resources representative having jurisdiction over the Participant may recommend, and the Senior Vice President Global Human Resources, acting on behalf of the Company, will have complete discretion to approve a different amount of severance pay and/or benefits, either higher or lower (including no severance pay and/or benefits at all), than otherwise

provided on Exhibit A, provided that no such discretion shall be applicable to a Termination Due to Change of Control.

3.08    Change of Control Notification.  Not later than six months following a Change of Control, the Company shall notify all of its otherwise eligible Employees (who were Employees as of the day immediately before the Change of Control) who have not been given notice of termination of whether they will, until the second anniversary of such Change of Control, continue in the same job, be offered a Comparable Position, or be involuntarily terminated.

**Article 4**
**METHOD OF SEVERANCE PAYMENTS**

4.01    Method of Payment.  The severance pay to which a Participant is eligible, as calculated pursuant to Article 3, shall be paid in accordance with the provisions of this Article 4.

    (a)    Severance payments payable under this Plan shall be made in a single sum cash payment.

    (b)    Payment shall be made by mailing to the last address provided by the Participant to the Company.  Separate payment(s) shall be made to pay any earned and unused vacation pay for the year during which the Employment Termination Date occurs. In no event shall interest be credited on any amounts for which a Participant may become eligible.

    (c)    In general, payments shall be made as promptly as practicable after the participant's Employment Termination Date, the execution of the release required under Section 2.03, and the expiration of the required release revocation period.

# Article 5
## THE ADMINISTRATIVE COMMITTEE

5.01    Authority and Duties.  The Administrative Committee shall have the full power, authority, and discretion to construe, interpret, and administer the Plan, to correct deficiencies therein, and to supply omissions.  All decisions, actions, and interpretations of the Administrative Committee shall be final, binding, and conclusive upon the parties, subject only to determinations by the applicable claims fiduciary with respect to denied claims for Benefits.  Unless the Administrative Committee determines otherwise, the Human Resources Managers of the Company shall have the authority to act on behalf of the Administrative Committee in all respects set forth in this Section 5.01.

5.02    Records.  The Company shall supply to the Administrative Committee all records and information necessary to the performance of the Administrative Committee's duties.

5.03    Payment.  The Company shall make payments of Benefits, in such amount as determined by the Administrative Committee under Article 3, from its general assets to Participants in accordance with the terms of the Plan, as directed by the Administrative Committee.

## Article 6
### AMENDMENT AND TERMINATION

6.01   The Plan may be amended, suspended, discontinued, or terminated at any time by the Board of Directors of Schering-Plough Corporation or its designee, in whole or in part, for any reason, and without either the consent of or the prior notification to any Participant. No such amendment shall give the Company the right to recover any amount paid to a Participant prior to the date of such amendment. Any such amendment, however, may cause the cessation and discontinuance of payments of Benefits to any person or persons under the Plan. No such amendment made following a Change of Control may reduce the benefits to which any Participant may become entitled in the two years following such Change of Control. Notwithstanding the foregoing, no amendment of any kind may be made to the Plan for a period of two years following a Change of Control.

## Article 7
### CLAIMS PROCEDURES

7.01    Claim.  Each eligible terminated Employee may contest the administration of Benefits by completing and filing with the Severance Benefit Plan Committee a written request for review in the manner specified by the Administrative Committee.  Each such application must be filed within 60 days following the Employee's termination of employment and must be supported by such information as the Severance Benefit Plan Committee deems relevant and appropriate.

7.02    Appeals of Denied Claims for Benefits.  In the event that any claim for benefits is denied in whole or in part, the claimant whose claim has been so denied shall be notified of such denial by the Severance Benefit Plan Committee within 90 days of receipt of the claim (unless the Severance Benefit Plan Committee determines that special circumstances require an extension of time of up to an additional 90 days for processing the claim).  The notice advising of the denial shall specify the reason(s) for denial, make specific reference to relevant Plan provisions, describe any additional material or information necessary for the claimant to perfect the claim (explaining why such material or information is needed), and shall advise the claimant of the procedure for the appeal of such denial and a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on appeal.  All appeals shall be made by the following procedure:

(a)    A claimant whose claim has been denied shall file with the Administrative Committee a notice of desire to appeal the denial.  Such notice shall be filed within 60 days of notification by the Severance Benefits Plan Committee of the initial claim denial, be made in writing, and set forth all of the facts upon which the appeal is based.  Appeals not timely filed shall be barred.

(b)    The Administrative Committee shall consider the merits of the claimant's written presentations, the merits of any facts or evidence in support of the denial of benefits, and such other facts and circumstances as the Administrative Committee shall deem relevant.

(c)    The Administrative Committee shall render a determination upon the appealed claim within 60 days of its receipt of such appeal (unless the Administrative Committee determines that special circumstances require an extension of time of up to an additional 60 days for processing the appeal).  The determination shall specify the reason(s) for the denial, make specific reference to relevant Plan provisions, and contain a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA.

(d)    The determination so rendered shall be binding upon all parties.

No Employee may bring a civil action under Section 502(a) of ERISA until the Employee has exhausted his or her rights under this Section 7.02.

## Article 8
### MISCELLANEOUS

8.01    Nonalienation of Benefits.  None of the payments, benefits, or rights of any Participant shall be subject to any claim of any creditor, and, in particular, to the fullest extent permitted by law, all such payments, benefits and rights shall be free from attachment, garnishment, trustee's process, or any other legal or equitable process available to any creditor of such Participant.  No Participant shall have the right to alienate, anticipate, commute, plead, encumber, or assign any of the benefits or payments which he/she may expect to receive, contingently or otherwise, under the Plan.

8.02    No Contract of Employment.  Neither the establishment of the Plan, nor any modification thereof, nor the creation of any fund, trust or account, nor the payment of any benefits shall be construed as giving any Participant or Employee, or any person whosoever, the right to be retained in the service of the Company, and all Participants and other Employees shall remain subject to discharge to the same extent as if the Plan had never been adopted.

8.03    Severability of Provisions.  If any provision of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and the Plan shall be construed and enforced as if such provisions had not been included.

8.04    Heirs, Assigns, and Personal Representatives.  The Plan shall be binding upon the heirs, executors, administrators, successors, and assigns of the parties, including each Participant, present and future.

8.05    Headings and Captions.  The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be employed in the construction of the Plan.

8.06    Number.  Except where otherwise clearly indicated by context, the singular shall include the plural, and vice-versa.

8.07    Unfunded Plan.  The Plan shall not be funded.  No Participant shall have any right to, or interest in, any assets of Schering-Plough that may be applied by Schering-Plough to the payment of Benefits.

8.08    Payments to Incompetent Persons, Etc.  Any benefit payable to or for the benefit of a minor, an incompetent person or other person incapable of receipting therefor shall be deemed paid when paid to such person's guardian or to the party providing or reasonably appearing to provide for the care of such person, and such payment shall fully discharge Schering-Plough, the Administrative Committee and all other parties with respect thereto.

8.09    Lost Payees.  Benefits shall be deemed forfeited if the Administrative Committee is unable to locate a Participant to whom Benefits are due.  Such Benefits shall be reinstated

if application is made by the Participant for the forfeited Benefits within one year of the Participant's Employment Termination Date and while the Plan is in operation.

8.10    <u>Controlling Law.</u>  The Plan shall be construed and enforced according to the laws of the State of New Jersey to the extent not superseded by federal law.

### SCHERING-PLOUGH CORPORATION
### SEVERANCE PAY PLAN
### EXHIBIT A

### Termination Due to Workforce Restructuring

(chart shows amount of severance pay in weeks of Base Pay)

| Years of Service | Bands A-C | Bands D-O;<br>Base <$275,000 | Bands D-O;<br>Base ≥ $275,000 |
|---|---|---|---|
| 1 | 15 | 26 | 39 |
| 2 | 15 | 26 | 39 |
| 3 | 15 | 26 | 39 |
| 4 | 15 | 26 | 39 |
| 5 | 15 | 26 | 39 |
| 6 | 17 | 26 | 39 |
| 7 | 19 | 26 | 39 |
| 8 | 21 | 26 | 41 |
| 9 | 23 | 28 | 43 |
| 10 | 25 | 30 | 45 |
| 11 | 27 | 32 | 47 |
| 12 | 29 | 34 | 49 |
| 13 | 31 | 36 | 51 |
| 14 | 33 | 38 | 53 |
| 15 | 35 | 40 | 55 |
| 16 | 37 | 42 | 57 |
| 17 | 39 | 44 | 59 |
| 18 | 41 | 46 | 61 |
| 19 | 43 | 48 | 63 |
| 20 | 45 | 50 | 65 |
| 21 | 47 | 52 | 67 |
| 22 | 49 | 54 | 69 |
| 23 | 51 | 56 | 71 |
| 24 | 53 | 58 | 73 |
| 25 | 55 | 60 | 75 |
| 26 | 57 | 62 | 77 |
| 27 | 59 | 64 | 79 |
| 28 | 61 | 66 | 81 |
| 29 | 63 | 68 | 83 |
| 30 and above | 65 | 70 | 85 |

SCHERING-PLOUGH CORPORATION
SEVERANCE PAY PLAN
EXHIBIT A (CONT'D)

Termination Due to Non-Performance

(chart shows amount of severance pay in weeks of Base Pay)

| Years of Service | Bands A-O |
|---|---|
| 1 | 8 |
| 2 | 8 |
| 3 | 8 |
| 4 | 8 |
| 5 | 8 |
| 6 | 8 |
| 7 | 8 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| 26 | 26 |
| 27 | 27 |
| 28 | 28 |
| 29 | 29 |
| 30 and above | 30 |

## SCHERING-PLOUGH CORPORATION
## SEVERANCE PAY PLAN
## EXHIBIT B

### Termination Due to Change of Control

**(CHART SHOWS AMOUNT OF SEVERANCE PAY IN WEEKS OF BASE PAY)**

| COLUMN A (If this column is applicable, multiply applicable number of weeks by Base Pay excluding Target Incentive) | | | | COLUMN B (If this column is applicable, multiply applicable number of weeks by Base Pay including 1/52 of Target Incentive) | | |
|---|---|---|---|---|---|---|
| Weekly / Hourly | Semi-Monthly | E-Grade | Years of Service | Bands A-C | Bands D-O; Base$^1$ < $275,000 | Bands D-O; Base$^1$ ≥ $275,000 |
| 8 | 16 | 32 | 1 | 23 | 39 | 59 |
| 8 | 16 | 32 | 2 | 23 | 39 | 59 |
| 12 | 16 | 32 | 3 | 23 | 39 | 59 |
| 16 | 16 | 32 | 4 | 23 | 39 | 59 |
| 20 | 20 | 40 | 5 | 23 | 39 | 59 |
| 24 | 24 | 48 | 6 | 26 | 39 | 59 |
| 28 | 28 | 56 | 7 | 29 | 39 | 59 |
| 32 | 32 | 64 | 8 | 32 | 39 | 62 |
| 36 | 36 | 72 | 9 | 35 | 42 | 65 |
| 40 | 40 | 80 | 10 | 38 | 45 | 68 |
| 44 | 44 | 88 | 11 | 41 | 48 | 71 |
| 48 | 48 | 96 | 12 | 44 | 51 | 74 |
| 52 | 52 | 104 | 13 | 47 | 54 | 77 |
| 56 | 56 | 104 | 14 | 50 | 57 | 80 |
| 60 | 60 | 104 | 15 | 53 | 60 | 83 |
| 64 | 64 | 104 | 16 | 56 | 63 | 86 |
| 68 | 68 | 104 | 17 | 59 | 66 | 89 |
| 72 | 72 | 104 | 18 | 62 | 69 | 92 |
| 76 | 76 | 104 | 19 | 65 | 72 | 95 |
| 80 | 80 | 104 | 20 | 68 | 75 | 98 |
| 84 | 84 | 104 | 21 | 71 | 78 | 101 |
| 88 | 88 | 104 | 22 | 74 | 81 | 104 |
| 92 | 92 | 104 | 23 | 77 | 84 | 107 |
| 96 | 96 | 104 | 24 | 80 | 87 | 110 |
| 100 | 100 | 104 | 25 | 83 | 90 | 113 |
| 104 | 104 | 104 | 26 | 86 | 93 | 116 |
| 104 | 104 | 104 | 27 | 89 | 96 | 119 |
| 104 | 104 | 104 | 28 | 92 | 99 | 122 |
| 104 | 104 | 104 | 29 | 95 | 102 | 125 |
| 104 | 104 | 104 | 30 and above | 98 | 105 | 128 |

---

$^1$ For this purpose, Base Pay excludes Target Incentive.

-19-

**EXHIBIT B**

**No. C08-03944 MMC**



Schering-Plough
1095 Morris Ave.
Union, NJ 07083-7143 USA
Phone +1 908 298 4000
www.schering-plough.com

January 16 2008

Dr. Shelley B. Blam
51 Oak Vale Avenue
Berkeley, CA  94705

Re: Claim for Benefits Under the Schering-Plough Corporation Severance Benefit Plan

Dear Dr. Blam:

The Schering-Plough Corporation Severance Benefit Plan Committee (the "Committee") reviewed your initial claim for an additional 18 weeks of severance benefits under the Schering-Plough Corporation Severance Benefit Plan (the "Plan"). Unfortunately, the Committee must deny your claim for an additional 18 weeks of severance benefits under the Plan. A discussion of the claim, applicable Plan provisions and the reasons for the denial are set forth herein.

## I.   **Background**

You are a former Medical Science Liaison ("MSL") with Schering-Plough Corporation (the "Company"). At the time you were employed with the Company, you executed a Confidentiality and Invention Agreement, dated December 25, 2005, that prohibits the disclosure of confidential information to outsiders (the "Confidentiality Agreement").

On April 25, 2007 you received (and signed) a Letter of Expectation from your manager Chris Kocun indicating that you had not demonstrated the Leader Behaviors and Business Acumen necessary to deal with both internal and external customers with trust and integrity. The stated purposes of the letter was to inform you of the status of your job performance as of April 2007 and to inform you that a planned review would be undertaken in 30 days to assess whether or not positive changes had been made.

On June 29, 2007, you released information to an outside investigator regarding the development of a Company product (an oncology compound). Only a few Company employees, including you, knew of the existence of this product's development and these employees were asked to keep all information regarding this product strictly confidential and not share it with any external sources.

Based on the June 29, 2007 incident and your previous performance history as set forth in the April 25, 2007 Lette      Expectation, Senior Company officials decided to terminate your employment with t.  Company as of July 17, 2007. At the time of your termination, your termination was classified as a Termination Due to Non-Performance and you were provided with 8 weeks of severance pay in accordance with the terms of the Plan.

In a claim submission dated October 10, 2007, you have made a claim for an additional 18 weeks of severance benefits. In your claim, you make the following assertions:

- Your termination was wrongly classified as a Termination Due to Non-Performance.

Dr. Shelley B. Blam
January 16 2008
Page 2

- You did not violate any clear Company policy by disclosing the existence of the oncology compound to an external research investigator.

- Your termination should have been classified as a Termination Due To Workforce Restructuring because (i) the Company made a decision to place the other employee in your position before the June 29th incident, and (ii) the June 29th incident was used as a pretext for your termination so the Company could move this other employee into your position.

- You are due the additional 18 weeks of severance pay that should have been paid to you under the terms of the Plan for a Termination Due to Workforce Restructuring.

## II.   Applicable Plan Provisions and Relevant Law.

Plan Section 2.01(a) states an employee who has provided the Company with at least 90 consecutive days of service and incurs a Termination Due to Non-Performance or a Termination Due to Workforce Restructuring is eligible for severance benefits under the Plan.

Plan Section 1.24, defines "Termination Due to Non-Performance" as a "termination of an Employee's employment by the Company due to the Employee's failure to perform his or her job assignments in a satisfactory manner, as determined by the Administrative Committee in its sole discretion, for purposes of the Plan only."

Plan Exhibit A provides that an employee in Bands A through O with less than 9 years of service under the Plan will receive 8 weeks of severance pay if the employee incurs a Termination Due to Non-Performance.

Plan Section 1.24, defines "Termination Due to Workforce Restructuring" as a "termination of an Employee's employment by the Company due to a Decline to Relocate, a Job Elimination, a Job Restructuring, or such other termination determined by the Administrative Committee."

Plan Section 1.14, defines "Job Elimination" as a "termination of a Participant's employment by the Company due to job elimination, as determined by the Administrative Committee in its sole discretion, for purposes of the Plan only."

Plan Section 1.15, defines "Job Restructuring" as a "termination of a Participant's employment by the Company due to a change in required competencies or qualifications for the Participant's job, as determined by the Administrative Committee in its sole discretion, for purposes of the Plan only."

## III.   Analysis.

In considering a claim for Plan benefits, the Committee is bound by the Plan's terms, as required by the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the facts that have been presented. Under the terms of the Plan, a Termination Due to Non-Performance is defined as the failure of an employee to perform his or her job assignments in a satisfactory manner, as determined by the Committee in its sole discretion.

Dr. Shelley B. Blam
January 16 2008
Page 3

As indicated by the facts set forth above, you received (and signed) a Letter of Expectation on April 25, 2007 indicating that you had not demonstrated the Leader Behaviors and Business Acumen necessary to deal with both internal and external customers with trust and integrity. This letter clearly notified you that your performance was not satisfactory as of that time.

Shortly thereafter, you provided an external research investigator with highly confidential information, thereby compromising the Company development of an oncology compound. By divulging the information about the oncology compound, you clearly violated the Company's policy C-148 on Proprietary and Confidential Information and breached the terms of your Confidentiality Agreement pursuant to which you agreed not to disclose any "Confidential Information" to any non-employee for any reason. "Confidential Information" is defined in the Confidentiality Agreement to include research and "other information not generally known and relating to any phase of Schering-Plough business which provides an opportunity to obtain an advantage over competitors who do not have or know the information." Because every employee who signs a confidentiality agreement is expected to keep proprietary information confidential as part of his or her job assignment, the Committee usually considers failures to comply with the Company's policy C-148 on Proprietary and Confidential Information and the terms of a confidentiality agreement as misconduct, which is a terminable offense. An employee terminated for misconduct is not eligible to receive severance benefits under the Plan. However, given the facts and circumstances surrounding your situation, the Committee viewed these failures as reflective of your judgment and your inability to perform job assignments in a satisfactory manner. Accordingly, the Committee viewed your termination as a Termination Due to Non-Performance under the Plan, which does permit the payment of severance benefits.

Your termination of employment cannot be classified as a Termination Due to Workforce Restructuring under the Plan. Pursuant to the Plan, a Termination Due to Workforce Restructuring involves the relocation of an employee's job, the elimination of the employee's position, or a change in the required competencies or qualifications for the position. The facts of your claim do not indicate that you were asked to relocate for your job, that your job was eliminated or that a change was made in the required competencies or qualifications for the job. Instead, after the termination of your employment, the Company offered your vacant position to another employee who already had experience in this position.

Based on the language of the Plan and the facts presented, the Committee has determined that your termination qualifies as a Termination Due to Non-Performance and does not qualify as a termination Due to Workforce Restructuring. Therefore, your claim for an addition 18 weeks of severance pay under the Plan is denied.

## III.  **Determination.**

Based upon the analysis above, the Committee has determined you are not entitled to an additional 18 weeks of severance benefits under the Plan. Accordingly, your claim for an additional 18 weeks of severance benefits has been denied.

Dr. Shelley B. Blam
January 16 2008
Page 4

## IV.  Appeal of Determination.

In accordance with the Claims Procedure of the Plan, you may, within sixty days after receiving this letter, appeal this decision in writing to the Schering-Plough Corporation Severance Benefit Plan Committee (the "Committee") at 2000 Galloping Hill Road, Kenilworth, NJ 07033.  You and your authorized representative(s) have a right to review all pertinent documents and submit comments or any additional information, in writing, that you feel the Committee should consider.

If you decide to file a written appeal, a written decision on that appeal will be rendered within 60 days of the request for review stating specific reasons and citing specific Plan references for the decision.  If special circumstances require an extension of time for processing the appeal, written notice will be given to you before the end of the initial 60-day period and will indicate the special circumstances requiring an extension of time and the date by which a final decision is expected.  The decision on appeal will be final. However, if your appeal is denied, you have the right to bring a civil action under section 502(a) of the Employee Retirement Income Security Act of 1974, as amended.

Sincerely,

Vincent Sweeney

Vincent Sweeney
On behalf of the Schering-Plough Severance Benefit Plan Committee

cc:    Steve Condie, Esq. (w/enclosure)
       Kristi Payne Benitez, Esq. (w/o enclosure)

**EXHIBIT C**

**No. C08-03944 MMC**

Schering-Plough Corporation
1095 Morris Ave.
Union, NJ 07083-7143 USA
Phone +1 908 298 4000
www.schering-plough.com

May 8, 2008



VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Dr. Shelley B. Blam
51 Oak Vale Avenue
Berkeley, CA  94705

Re: Appeal of Claim for Benefits Under the Schering-Plough Corporation Severance Benefit Plan

Dear Dr. Blam:

The Schering-Plough Corporation Severance Benefit Plan Committee (the "Committee")
reviewed the appeal you submitted of your denied claim for an additional 18 weeks of severance
benefits (the "Appeal") under the Schering-Plough Corporation Severance Benefit Plan
(the "Plan").  Unfortunately, the Committee must deny the Appeal. A discussion of the
background regarding the initial claim and the Appeal, applicable Plan provisions and policies
and the reasons for the denial are set forth herein.

## I.  **Background**

You are a former Medical Science Liaison ("MSL") with Schering-Plough Corporation (the
"Company"). On July 17, 2007, your employment with the Company was terminated for non-
performance.  Pursuant to the terms of the Plan, you were then offered 8 weeks of severance pay.
On October 10, 2007, you submitted a claim for an additional 18 weeks of severance benefits
under the Plan.  On January 8, 2008, the Committee reviewed and denied the claim.

In response to the denial of your claim, on March 7, 2008, the Company received the Appeal.  In
the Appeal, you assert that your claim for an additional 18 weeks of severance benefits should not
have been denied because the termination was a pre-text for a workforce restructuring and not
due to unsatisfactory performance.  Specifically, you assert that your termination could not have
been for unsatisfactory performance and should not have been classified as a Termination Due to
Non-Performance because:

- An April 25th Letter of Expectation provided to you and indicating that you had not
  demonstrated the Leader Behaviors and Business Acumen necessary to deal with both
  internal and external customers with trust and integrity (the "Letter of Expectation") was
  not a justification for your termination of employment because you were told in follow up
  conversations with your supervisor, that "everything was going well;"

- You were never told to keep the existence of a Company oncology compound that was in
  development (the "Company Product") strictly confidential or that you were not to
  discuss its existence with any external sources; and.

- MSL's must discuss information which falls within the Company's definition of
  "Confidential Information" with independent investigators as a routine part of their job,

Dr. Shelley B. Blam
May 8, 2008
Page 2

so classification of disclosure of Confidential Information as non-performance is
inappropriate for an MSL and a pre-text for defrauding MSLs of severance benefits under
the Plan.

In response to your Appeal, the Committee reviewed the following additional information
provided by Christopher Kocun, Senior Director of Global Medical Affairs.

At the Temodar Brand Meeting held on June 26th, it was discussed that an investigator submitted
a proposal to use the Company's drug Temodar in combination with another Company's CHk1
inhibitor. Due to existence of the Company Product in the Company's developmental pipeline, it
was decided at this meeting that no further conversations should take place between you and the
investigator until intellectual property ("IP") input was obtained and a decision was made around
this study and providing any feedback. This decision was conveyed at this meeting to all the
MSLs and a specific direction was given to you on this topic.

Despite the instruction not to contact the investigator, a few days later you spoke to the
investigator and provided positive feedback regarding his proposal. At this time, you also told
the investigator about the existence of the Company Product and indicated that it could result in
an IP issue. On July 2, you emailed Paul Kirschmier regarding this conversation and confirmed
in an email that you had told the investigator about the Company Product, despite the instructions
to refrain from any further conversations with the investigator on this topic.

On July 3rd, the oncology MSL team lead spoke to you to find out about your conversation and
instructed you not to have any contact with the investigator until certain issues had been be
resolved, one of them being the lack of confidentiality agreement with the investigator, another
being the disclosure of the existence of the Company Product and another the possible
combination of the Company Product with Temodar. Despite these instructions, on July 4th, you
again spoke to the investigator regarding his proposal.

### III.  Applicable Plan Provisions and Company Policies.

Plan Section 2.01(a) states an employee who has provided the Company with at least 90
consecutive days of service and incurs a Termination Due to Non-Performance is eligible for
severance benefits under the Plan.

Plan Section 1.24, defines "Termination Due to Non-Performance" as a "termination of an
Employee's employment by the Company due to the Employee's failure to perform his or her job
assignments in a satisfactory manner, as determined by the Administrative Committee in its sole
discretion, for purposes of the Plan only."

Plan Exhibit A provides that an employee in Bands A through O with less than 9 years of service
under the Plan will receive 8 weeks of severance pay if the employee incurs a Termination Due to
Non-Performance.

The Position Description for a Medical Science Liaison (the "MSL Job Description"), which is
enclosed, sets forth the major activities and responsibilities of a Medical Science Liaison
("MSL"). It includes the following statement:

Dr. Shelley B. Blam
May 8, 2008
Page 3

"Depending on the life cycle / needs of a product, proactively share medical information with brand aligned national / regional Key Opinion Leaders and local Practice Leaders. For approved products, share high level educational scientific information, and clinical guidelines, differentiating product attributes and outcomes studies. For non-approved products / indications, educate KOLs on ongoing / planned clinical studies, publications, disease state, mechanism of action and other company approved information in the public domain. For all products, develop and maintain high level scientific relationships with thought leaders."

IV.  **Analysis.**

In considering a claim for Plan benefits, the Committee is bound by the Plan's terms, as required by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Under the Plan, an employee whose employment is terminated due to unsatisfactory performance experiences a Termination Due to Non-Performance and is entitled to only 8 weeks of severance benefits.

In your appeal, you argue that your termination cannot be classified as a Termination Due to Non-Performance based on the Letter of Expectation because in a follow up conversation with your supervisor regarding the Letter of Expectation you were told "everything was going well." However, your termination was not based solely on the Letter of Expectation. Shortly after the meeting in which you were told "everything was going well", you provided an external research investigator with highly confidential information about the Company Product, thereby compromising its development. It was the combination of the events described in the Letter of Expectation and the disclosure of confidential information that led the Company to conclude that your termination was the most appropriate course of action and that the termination should be classified as a Termination Due to Non-Performance. The combination of the facts clearly support a determination that you failed to satisfactorily perform the duties of your position and the classification of your termination as a Termination Due to Non-Performance, despite any short period of improvement in between these events.

You also argue that your termination cannot be a Termination Due to Non-Performance because you were not told to keep the existence of the Company Product confidential and all MSLs must disclose confidential information as a part of their job. However, as described above, your supervisor, Chris Kocun, recalls that you were clearly told to not discuss the study and the existence of the Company Product with the outside investigator. As described by your supervisor, you were told that you should not discuss the outside study with the investigator until certain IP issues were addressed. Despite this warning, a few days later you talked with the outside investigator and at that time disclosed to the outside investigator the existence of the Company Product and the combination of the Company Product with Temodar. Thereafter you were again told to cease all contact with the outside investigator, but again ignored this directive and contacted him to discuss follow up issues.

The MSL Job Description also clearly indicates that while MSLs are required to communicate with outside parties regarding products being developed by the Company, this disclosure has limits. Specifically, for non-approved products, MSLs are only permitted to disclose "information in the public domain." The information disclosed by you to the outside investigator

Dr. Shelley B. Blam
May 8, 2008
Page 4

was not in the public domain, and therefore, not the type of disclosure permitted by an MSL. Since you were specifically informed not to discuss the Company Product with the outside investigator and this type of disclosure is not a required part of the MSL job, the Committee has determined that the facts (which include the Letter of Expectation) clearly support the Company's conclusion that your performance was unsatisfactory. As such, the classification under the Plan of your termination as Termination Due to Non-Performance was appropriate and not a pre-text for a Termination Due to Workforce Restructuring or an attempt to defraud you of benefits under the Plan.

**V.     Determination.**

Based upon the analysis above, the Committee has determined you are not entitled to an additional 18 weeks of severance benefits under the Plan. Accordingly, the Appeal has been denied.

Please note that as a result of this determination, you are entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records and other information relevant to your claim for benefits.

**VI.     Final Determination**

The decision of the Committee on your appeal is a final determination and you have exhausted the claims procedures provided by the Plan. As a result of the denial of your Appeal, you have a right to bring a civil action under section 502(a) of ERISA.

Sincerely,

*Vincent Sweeney*

Vincent Sweeney
On behalf of the Schering-Plough Severance Benefit Plan Committee

Enclosure

cc:     Steve Condie, Esq. (w/ enclosure)
        Kristi Payne Benitez, Esq. (w/ enclosure)

s:Compben/vince/Severance AppealBlam08a.doc

 Schering-Plough

# POSITION DESCRIPTION

| TITLE | FIRST LEVEL | DATE |
|---|---|---|
| Medical Science Liaison | | |

| DIVISION | SECOND LEVEL |
|---|---|
| Global Medical Affairs | |

| DEPARTMENT | VICE PRESIDENT (GRADE 90 & ABOVE) |
|---|---|
| Medical and Scientific Services | |

| LOATION | HUMAN RESOURCES |
|---|---|
| New Jersey | |

| DATE | JOB CLASS CODE | COMPENSATION |
|---|---|---|
| June 22, 2006 | | |

## SUMMARY OF POSITION
*Briefly summarize the primary purpose of the position*

To exchange peer to peer medical and scientific information with SP customers. Incumbent is responsible for ensuring they are fully versed in the therapeutic area, up-to-date on all major studies, both ongoing and completed, competitive product information and clinical data.

## MAJOR ACTIVITIES AND RESPONSIBILITIES
Describe briefly the major activities of the position. Indicate the approximate percentage of time spent on each activity.

Depending on the life cycle / needs of a product, proactively share medical information with brand aligned national / regional Key Opinion Leaders and local Practice Leaders. For approved products, share high level educational scientific information, and clinical guidelines, differentiating product attributes and outcomes studies. For non-approved products / indications, educate KOLs on ongoing / planned clinical studies, publications, disease state, mechanism of action and other company approved information in the public domain. For all products, develop and maintain high level scientific relationships with thought leaders.

Provide field based medical information / education to physicians, address unsolicited queries with medical accuracy and fair balance

For US Managed Care, provide proactive communications including formulary presentations, complex medical information / clinical outcomes data, and build peer to peer relationship with Managed Care Medical / Pharmacy Directors

Bring in investigator initiated studies to the SRT and follow through with investigators to publication / presentation. Facilitate Schering Sponsored Phase IV and earlier studies if appropriate, identifying study sites as needed.

Assist in Advisory Board activities, including Specialty advisory boards, national and regional Advisory Boards, Respiratory Leadership Council, LCIC, and others.

Represent GMA at US Medical Congresses and Conventions, manning medical education booths and facilitating appropriate medical information exchange In addition, monitor and facilitate pre-Congress abstract submissions to the GMA Publications department, attend poster sessions and oral presentations during medical meetings, and provide post-meeting reports summarizing key data from medical meeting.

Actively gather and monitor competitive intelligence,

Providing clinical education and therapy training support to sales force.

Provide special projects such as assistance in competitive information gathering, slide kit development, literature review and others medical information related act ivies as directed

**ORGANIZATIONAL STRUCTURE**
*Attach a copy of current and proposed organization charts indicating the management, peer and subordinate relationships to this position.*

Director MSS
MSS

**SCOPE MEASURES**
*List quantitative measures of the scope of the position (i.e., staff supervised, approval authority, operating budget, sales volume, dollar value of projects, etc.)*

**BACKGROUND REQUIREMENTS**
*List the minimum academic credentials, professional certifications, years of experience and specific skills required for this position.*

Must be a MD., Pharm D, or PhD in a life science, preferably with specialization and/or clinical experience in the relevant therapeutic area.
Minimum of 3 years demonstrated success and accomplishment in the pharmaceutical industry, managed care organization or related experience.
Requires strong scientific baseline knowledge in therapeutic area, clinical trials methods, implementation and interpretation, sound scientific and clinical judgment, and eagerness to learn more in depth in therapeutic area
Requires strong, confident and engaging presentation skills
Requires outstanding communication and persuasive skills.
Requires a proactive "can do" attitude and passion for the products
Requires strong customer facing skills, listening skills, probing skills, and flexibility
Requires strong cross functional attitude to work collaboratively with colleagues in GMA, Marketing, Sales, Managed Markets, and SPRI
Experience within a clinical drug development environment preferred.
Must be able to travel up to 60%
Candidates must be vetted through cross functional brand team / Managed Market partners
MSL Metrics:  MSL activity is tracked to expose the number of KOL contacts, managed care contacts, unsolicited queries, congress activities, and special projects.  MSL measurement of success will be gauged by the quality of IIS and publication support they provide, how effective they represent GMA to customers, and by feedback from cross functional partners and KOLs on their professionalism, responsiveness, presentation and communica    skills, and proactive attitude.